MEMORANDUM OF DECISION
The petitioner father, Sean A., filed an application with the Guilford Probate Court on June 2, 1995, for removal of the respondent mother, Sherry S., as guardian of the couple's minor child, Michael A. The father is 33 years old and mother is 31 years of age. The child, Michael, was born on March 25, 1992. He is currently 4 years of age and residing under temporary custody orders with Norma A., the paternal grandparent. On October 2, 1995, respondent mother's attorney filed a motion to transfer the case to Superior Court in accord with General Statute § 45a-623.
When an application for removal of guardian is transferred to Superior Court, the Superior Court sits as a Probate Court and is restricted by the Probate Court's jurisdictional limitation.Carten v. Carten, 153 Conn. 603, 614-615 (1966). A Court of Probate can exercise only such jurisdiction as is conferred upon it by Statute. In Re Jason D., 13 Conn. App. 626, 631 (1988). CT Page 5835
This proceeding is governed by General Statutes §§ 45a-604
to 45a-622 inclusive. General Statute § 45a-605 requires that "[t]he provisions of sections 45a-603 to 45a-622, inclusive, shall be liberally construed in the best interests of any minor child affected by them." "This is a `clear' statement by the legislature that in any proceeding to remove a parent as guardian' the crucial issue is the best interest of the child.'. . . . General Statutes . . . which govern . . . the termination of parental rights are not prefaced by such a declaration of legislative policy . . . . It is relevant, and perhaps dispositive . . in any proceeding to transfer guardianship" . . that a "parent may be removed as guardian, notwithstanding that he or she has maintained a reasonable degree of interest or concern for a minor's welfare, where the parent nonetheless has `failed to maintain a reasonable degree of . . . responsibility for the minor's welfare'." General Statutes §45a-610 (2) Garrett's Appeal from Probate, 44 Conn. Sup. 169, 182
(1996); affirmed 237 Conn. 233 (1996). In the present case the petitioner has claimed that the respondent mother has denied the child the care, guidance or control necessary for physical, educational, moral, or emotional well-being.[2] Principles of custody law in dissolution of marriage cases are often helpful in guardianship cases, for example:
 In the exercise of its awesome responsibility to find the most salutary custodial arrangement for the children of divorce the court must however take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being. Seymour v. Seymour, 180 Conn. 705, 711 (1980); Yontef vs Yontef, 185 Conn. 275, 283 (1981).
In determining the best interests of the child, the court may consider the parenting skills of the parties; Cappetta v.Cappetta, 196 Conn. 10, 17 (1985); family relations division report recommendations, Yontef, supra 281; or in this probate case, the social study prepared by the Department of Children and Families as required by General Statute § 45a-619 and Practice Book § 1043.1; manipulative and coercive behavior in . . . efforts to involve children in the marital dispute,Yontef, supra 281; continuity and stability of environment,Cappetta, supra 16; the flexibility of each parent to best serve the psychological development and growth of the child, Seymour,
CT Page 5836 supra 711; visitation having an adverse on the child at times,Ridgeway v. Ridgeway, 180 Conn. 533, 540 (1980); and emotional problems of parent, Simons v. Simons, 172 Conn. 341, 345 (1977). Many of these considerations relate to the facts of this case and are applicable whenever child placement is at issue.
FACTS
The trial of this case occurred over four days in July. The petitioner was represented by counsel as was the child. The respondent mother was represented by counsel and also, very effectively represented by a guardian ad litem who submitted an exceptional memorandum of law. The court heard from Sean A., the child's father, the petitioner in this case; the father's sister Kimberly and mother Norma, the paternal grandmother of this child who has the temporary custody of the child. The court further heard DCF workers, Jodi Silverman, Cindy O'Neil, Tina Gant and Sandra Montoya; pediatrician, Dr. Nancy Czarkowski; clinical psychologists Dr. David Mantell, and Dr. Ruth Grant; the respondent mother's mother Mary Ann, i.e. the child's maternal grandmother; the maternal grandmother's boyfriend James H.; Ruth Chico, who monitored visitation; and the counselor for mother at Harbor Health Services. Nearly 40 exhibits were introduced, including two reports of Dr. Michael A. Nelkin, recommending against placement of the child with his mother; a report from the court appointed psychologist Dr. David Mantell who recommended against placement with the mother; a report from Dr. Ruth Grant who recommended in mother's favor; and a report from a clinical psychologist, Kenneth Gilstein, showing the father to be an emotionally stable individual with no significant emotional difficulties.
The last witness was Dr. Eugene Piasetski, who qualified as an expert in traumatic brain injury. He testified, based on his review of the medical records and history given, that Sherry has suffered a traumatic brain injury from an automobile accident in 1985. As a result of the injury, Sherry must have medication, behavior intervention and biofeedback to manage her condition. Under cross examination and redirect, Dr. Piasetski indicated that this condition might cause her to become "unraveled and anxious under pressure" and could possibly cause her to have a personality disorder.
The petitioner claims that the fact that the mother, Sherry, did not testify warrants the application of the negative CT Page 5837 inference rule in Secondino v. New Haven Gas Co., 147 Conn. 672
(1960). The court declines the invitation to Invoke this rule and draws no conclusions from her failure to testify.
The court finds from the testimony the following facts:
The petitioner Sean A. and the respondent Sherry S. revived a high school romance and began living together in 1990. Sean wanted to marry Sherry, but she was not inclined to marriage. On March 25, 1992, they had a son Michael A. who is the subject of this petition. The couple moved into a house in Guilford and lived there until the present petition was filed on June 2, 1995.
For the first three years of Michael's life, his parents lived an outwardly normal life. Sean worked two and sometimes three jobs. Sherry told Dr. Mantell that Sean sometimes worked 85 hours per week. Sean managed the finances which included SSI payments and an annuity payment made to Sherry. In addition Sherry put $35,000 as a down payment on the home in Guilford. She received these funds as part of a settlement of a near-fatal car accident which occurred in November of 1985 that left her in a coma for three weeks and, ultimately, left her with a traumatic brain injury.
The relationship began to deteriorate at an unspecified time in 1995 when Sherry experienced physical problems that became partially disabling. Sean had been working many hours weekly, but was required to take on more responsibility at home. He had to go to work, come home, do laundry and household chores, drop Michael off at day care, and pick him up after work. During this time, Sherry sought help from Dr. Watstein, a psychiatrist who treated her for anxiety and expressed some concerns over Sherry's competency as a mother at that time, based upon her physical condition. Sean indicated in his testimony that Sherry was brought to the hospital a week after Michael was born, and he had to take care of the child as an infant. He indicated that whenever the child cried at night, he would wake up with him. When Sherry became incapacitated and unable to take care of herself, he had to quit one of his jobs in the spring of 1995 and enroll Michael in a day care center. He indicated that he took her to a lot of specialists. He would come home and find Sherry "on the bed crying her eyes out." She was hospitalized at St. Raphael's Hospital when she threatened to kill herself. Sean brought Michael to visit her and was surprised when she left the hospital after only three days. Somewhere around this time, CT Page 5838 Memorial Day week-end 1995, began a series of calls to the Guilford police department. Many of the calls resulted in police investigation and reports which were admitted as exhibits at the trial.
The social study, Petitioner's exhibit 13, indicates that in her self-reported history given to DCF, Sherry states that in 1978, at the age of 13, she attended the Acute Center in New Haven, due to having trouble with her mother Mary Ann, whom she alleges was physically abusive to her and because she witnessed her mother having sexual relations with various men. She reported that her parents separated when she was four. Her mother remarried but Sherry continued to have a strained relationship, due to her mother's promiscuity. Her mother has had three marriages and three divorces. When Sherry was 13, she went to live with her maternal uncle as problems with her mother escalated. She returned to live with her mother in 1979, and that is when she first met Sean at Guilford high school.
Sean does not make many complaints about Sherry until the spring of 1995 when she became physically and psychologically unable or unwilling to care for young Michael, who was then about 3 years old. Sherry, on the other hand, reports many complaints about Sean. She indicated to the DCF worker Tina Gant that Sean physically abused her and the child. She further complained that Sean would hold the child's head under water when he was bathing the child. The most serious of her complaints were complaints that were made while the case was pending: 1) that Sean sexually abused the child; 2) that he was not the biological father of the child and 3) a claim while the case was pending that Sean was having an affair. The court finds these claims to be without any merit.
A review of the police reports admitted into evidence is very enlightening. The first police complaint was dated April 10, 1995, before the custody battle. Sherry called the Guilford police to complain that her mother Mary Ann S. had been harassing her of late, sending letters and making phone calls stating that she was going to get custody of Michael because Sherry was an unfit parent. "She further stated she'd suffered abuse at her mother's hands since childhood, including being pushed down stairs, breaking a leg and a second broken leg while [the first broken leg] was in the cast. She wished her mother posted from her property, the day care center of her son and her boyfriend Sean A.'s place of business." The police officer went to Mary CT Page 5839 Ann's house where she denied that she had ever said anything about custody and that she had not abused [Sherry] during her daughter's childhood. She stated that Sherry was a constant pain and is on a variety of medications. Mary Ann referred the police to her brother and to Sean, who both confirmed Mary Ann's account of the story. No arrests were made.
The next police report indicated that Sherry and her mother Mary Ann went to the Guilford police department because Sherry was "concerned about her common-law husband returning home" from work that day. (Sherry) "was in the hospital and was released early; (Sean) is unaware." Further she reported that Sean was verbally abusive and that the "main issue is over who will have custody of their son, if and when they part ways". Sherry wanted the police to "throw (Sean) out of the house." The police officer "[l]ater spoke with (Mary Ann) who stated that (Sherry) was on a psychiatric floor at St. Raphael's and she is urging (Sherry) to return. That (Sherry) is not always accurate and has drastic mood swings. (Mary Ann) is going to urge (Sherry) to re-enter the hospital tonight."
On May 28, police responded regarding a domestic dispute. Sherry reported that Sean was mentally abusing her. "Sean was outside playing with their son Michael. He stated that Sherry is `totally unstable' and he was trying to avoid her. Sherry is insisting that she will be gaining full custody of Michael on May 31, 1995, per a court order. Sean stated this was untrue, and he was trying to keep things peaceful at home until he can decide what course of action to take to protect Michael." (Petitioner's exhibit 3).
The next police report is dated June 6, 1995. The Guilford police received a telephone call from Yale New Haven Hospital. A social worker reported that Sherry S. had just brought her three year old son Michael into the emergency room and reported that her common-law husband had sexually assaulted the child. The social worker said that Sherry S. was very vague on the information provided but believed the assault occurred on June 1, 1995, but could not provide any concrete information other than "Sean molested Michael." The social worker indicated that both he and a doctor had examined Michael and spoken with him alone. Michael stated that his father did not touch him in any way other than a tap on the arm one day. The hospital personnel interviewed the child and "could find no evidence in the slightest" that any abuse occurred. Yale considered the report unfounded. CT Page 5840 (Petitioner's exhibit 4).
The next police report occurred on Sept. 7, 1995. The Guilford police responded to a "problem between mother and daughter." The police officer went to Sherry's house and reported, "After I entered the residence, she deadbolt locked the door and pushed a large chair in front of it. I told her that she would have to move it when I left. She said it didn't matter and there was a need for it. I asked her about her complaint and she said that her mother had called her this morning and had threatened to go to her residence and `kill her'. She added that her mother has been harassing her for a long time. When asked what a long time was, she said since she was a baby." The officer left Sherry's house and went to speak with her mother. She said that Sherry had called her not visa versa. "They discussed the custody situation . . . on 09-06-95 her daughter (the complainant) had a DCF supervised visit w/her son. She added that her daughter `went off on him,' meaning her son, and DCF at that point terminated the visit." The police officer talked to Mary Ann's boyfriend who indicated they were trying to get Sherry into a 30 day program at Y.P.I. Mary Ann added that her daughter "calls her and says that she is going to kill herself and burn the house down so that her ex-boyfriend does not get her house."
On October 25, 1995, Sherry called the police again, claiming that the custodial paternal grandparents had been abusing Michael. A DCF caseworker and the police officer went to the home of the paternal grandparents and talked to them and to Michael. They found no signs of abuse and closed the file. (Petitioner's exhibit 6).
On November 1, 1995, the police officer went to the maternal grandmother's house. The grandmother Mary Ann indicated to the police that her daughter Sherry had called earlier in the day and was verbally abusive. Mary Ann wanted the police officer to call Sherry and notify her that she was not to call Mary Ann again. The police officer complied with the request.
On December 1, 1995, Sherry had her lawyer file a motion for blood grouping or DNA testing. In the motion Sherry alleged that Sean was not the biological father of the child, but that one John D. was the father of the child. The motion was granted on December 21, 1995. The blood/DNA testing results confirmed that the probability of paternity for Sean is 99.90%. Dr. Mantell indicated during his testimony that "[t]his was just another ploy CT Page 5841 to get rid of father . . . and to create in the child a profound sense of abandonment by the father."
In addition to the police reports, there was testimony by many witnesses unfavorable to Sherry. Sean testified regarding Sherry's behavior towards the child, including rubbing urine soaked training pants in two year old Michael's face when he had a toilet training accident. The petitioner's sister Kim testified that she witnessed Sherry, without good reason, pull Michael's pants down and slap the child's bare buttocks with such force that she, Kim, and her child were greatly distressed by the incident. Norma A., paternal grandmother and temporary custodian, testified that following visitation with his mother, the child would act out and have nightmares or wet his bed.
Both Tira [Tina] Gant and Ruth Chico of DCF testified as to specific incidents of mother's behavior that they witnessed while supervising her visitation with Michael. Ruth Chico testified that mother's behavior was emotionally abusive to the child. The behavior witnessed by Ms. Chico included mother's criticism of the child's clothing, hair, fingers, general appearance, cleanliness and language skills; mother's telling the child that (Sean) was not his real father, that his Sean stole all of her things, that he stole her and the child's money; that father and paternal grandmother do not allow him to eat or sleep, and that they make him drink beer. Sherry's outbursts included yelling and threatening Ms. Chico, using extremely profane language to Ms. Chico ("F___ you") in the child's presence; Michael would say to his mother, "Mommy, don't say those bad words." Sherry ended the visit marching out of the room with her back to the child and yelling at Michael, telling him that she doesn't love him any more. In fact, Sherry's behavior during visitation was so consistently abusive to the child that Ms. Chico testified that if only one incident of the above described behavior occurred, Ms. Chico labeled the visit a "good" visit.
The child's pediatrician testified that Sherry's anxiety about the child was "outside the normal range." It is curious to note that, despite all of the allegations of physical abuse made by Sherry after the custody dispute arose, she told the pediatrician at one of her visits that "Sean has never hit her, but he yells a lot."
Dr. David M. Mantell, the court appointed psychologist, testified that he had very strong concerns regarding the mother's CT Page 5842 victimization of the child in his presence. He testified that even though Sherry had been told that he would be preparing a report to the court concerning custody, mother could not refrain from inappropriate interaction with her son. Dr. Mantell's report states that "there is no doubt that [mother's] behavior is seriously disorganizing for the child." He further testified that mother was impaired psychologically in ways directly related to her ability to meet the child's needs. He testified that her behavior was noxious to the child, causing him to flee.
In conclusion, Dr. Mantell's report states, "I strongly recommend against allowing the child to live with the biological mother at the present time with or without supervision."
In addition to the direct victimization of the child by his mother, Dr. Mantell testified that subjecting the child to repeated unsubstantiated allegations of abuse is also victimization. The police reports highlight the numerous reports of mother's pattern of subjecting her child to repeated unsubstantiated allegations of physical and sexual abuse. See also Petitioner's exhibit 10, Dr. Nelken's report dated September 18, 1995, page 3; Petitioner's exhibits 12 13, DCF reports and respondent's exhibit A, Guilford Pediatrics medical report. Mother's obsession with discrediting father, at any cost to her son, is documented in the evidence as well. Dr. Jonathan Stein reports in the Addendum to his Medical Report For Sexual Assault that while the patient (Michael) was reluctant to have specimen's obtained, he was "convinced by mother's persuasion who insisted
that the tests be done so that `his father could be arrested'." (Emphasis in the original) See Petitioner's exhibit 8, page 2. Sherry subjected her son to procedures that included having specimens obtained from his anus and urethra to bolster a false allegation of sexual molestation. Subjecting her child to such invasive procedures solely for the purpose of supporting a false allegation is manipulative behavior intended to involve the child in a dispute between the adults.
The evidence put forth at trial demonstrates by clear and convincing evidence that the minor child Michael has been denied the care, guidance or control necessary for his physical and emotional well-being as required in General Statutes §45a-610 (3). The evidence further supports the petitioner's claim that it is in the child's best interest to have the mother removed as guardian of the child at this time. CT Page 5843
Regarding visitation, the testimony of Dr. Mantell and Ruth Chico suggests that mother is unable to refrain from behavior that is upsetting to the child, even in the presence of someone else. Dr. Mantell has recommended that education of mother concerning proper behavior at visitation is appropriate.
ORDER
Accordingly, it is ordered that the mother Sherry S. is hereby removed as guardian of the minor child Michael A. And that Sean A. remain the sole guardian and custodian of the child. The court orders that the mother and father attend a Parenting Education Program available through the Family Relations Division of the Superior Court. The mother shall be entitled to reasonable rights of visitation, as may be agreed upon by the parents, after discussion with the child's therapist. The visitation shall be supervised by a suitable adult other than the maternal grandmother. In the event the parties cannot agree upon visitation, they may proceed under the provisions of § 46b-61
of the General Statutes or by administrative review through DCF, if that program is available to them. Copies of the psychological evaluations and psychological reports conducted in this matter and admitted as full exhibits, together with this decision, shall be made available to any person assigned by the court to review and evaluate visitation issues.
Foley, J.